NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

———————————

JESSYCA P., DEVON J.,
*Appellants*,

v.

DEPARTMENT OF CHILD SAFETY, D.J., B.J., D.J.,
*Appellees*.

No. 1 CA-JV 21-0373
FILED 8-11-2022

———————————

Appeal from the Superior Court in Maricopa County
No. JD36450
The Honorable Michael J. Herrod, Judge

**AFFIRMED IN PART; VACATED IN PART**

———————————

COUNSEL

Thomas Vierling Attorney at Law, Phoenix
By Thomas A. Vierling
*Counsel for Appellant Jessyca P.*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Devon J.*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

_____

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which
Presiding Judge Jennifer B. Campbell and Judge Randall M. Howe joined.

_____

**M O R S E**, Judge:

¶1            Jessyca P. ("Mother") and Devon J. ("Father") appeal the
termination of their parental rights. For the following reasons, we affirm in
part and vacate in part.

**FACTS AND PROCEDURAL BACKGROUND**

¶2            Mother and Father (collectively, "Parents") are the parents of
D.J., B.J., and D.R.J. In 2018, before B.J. and D.R.J. were born, the
Department of Child Safety ("DCS") received reports of Mother's substance
abuse and domestic violence between Parents and filed a dependency
petition as to D.J. The juvenile court adjudicated D.J. dependent and set a
case plan of family reunification.

¶3            In late 2018 and early 2019, Parents engaged in a variety of
reunification services and DCS began to transfer custody of D.J. back to
Parents. Mother then gave birth to B.J. Weeks later, B.J. developed a fever
and Mother took him to the hospital. While there, hospital staff observed
Mother acting strangely and suspected she was under the influence of
drugs. Mother admitted to DCS that she was taking two to three times the
recommended dose of her medications. DCS then filed a dependency
petition as to B.J. and the court adjudicated him dependent.

¶4            Parents engaged in family reunification services during late
2019 and 2020. However, Mother tested positive for substances such as
oxycodone and fentanyl on multiple occasions, and, during a case manager
visit, Parents got into an argument and Father threw a set of keys at Mother.
In the fall of 2020, Mother gave birth to D.R.J. and acted aggressively toward
hospital staff. Subsequently, D.R.J. was placed in the foster home caring for
D.J. and B.J., DCS filed a dependency petition, and the juvenile court
adjudicated D.R.J. dependent.

¶5            In early 2021, Mother tested positive for methamphetamine
and amphetamine and was admitted to the hospital with "depressed mood
irritability and suicidal thoughts along with polysubstance abuse." Also in

early 2021, authorities arrested Mother for a 2020 incident of selling methamphetamine to an undercover police officer. Later in 2021, DCS moved to terminate Mother's and Father's parental rights to D.J., B.J., and D.R.J. (collectively, the "Children"). DCS moved to terminate Mother's parental rights on the substance-abuse ground under A.R.S. § 8-533(B)(3). DCS also moved to terminate Mother's and Father's parental rights to D.J. and B.J. on the fifteen month time-in-care ground and D.R.J. on the six and nine month time-in-care grounds. DCS alleged that Mother "remains unable to parent due to substance abuse" and Father's "co-dependence and submissiveness towards Mother . . . threatens his children's well-being as a result of her continued substance abuse."

**¶6** In October 2021, the juvenile court held a hearing and later terminated Mother's and Father's parental rights. The juvenile court found DCS proved by clear and convincing evidence the substance-abuse ground for termination of Mother's parental rights, the fifteen-month ground for termination of Mother's and Father's parental rights to D.J. and B.J., and the six- and nine-month grounds for termination of Mother's and Father's parental rights to D.R.J. The court further found that termination of parental rights was in the Children's best interests by a preponderance of the evidence.

**¶7** Mother and Father timely appealed and we have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

**¶8** A parent's right to custody and control of their children is fundamental, but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶¶ 11-12 (2000). The juvenile court may terminate a parent's rights if it finds "clear and convincing evidence demonstrates at least one ground listed in § 8-533(B)" and "a preponderance of evidence supports a finding that termination is in the child's best interests." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, ---, ¶ 13 (2022); Ariz. R.P. Juv. Ct. 66(C). Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004), we review a termination order for an abuse of discretion and will affirm the order unless "there is no reasonable evidence" to support the court's findings, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004) (citation omitted).

## I.      Termination of Mother's Parental Rights.

**¶9**          Mother argues that DCS failed to provide adequate reunification services as Arizona law requires and failed to meet the "reasonable accommodation requirements" of the Americans with Disabilities Act ("ADA").[1]

**¶10**          To terminate parental rights based on the time-in-care and substance-abuse grounds, DCS must show that it made diligent or reasonable efforts to provide appropriate reunification services.  A.R.S. § 8-533(B)(8) (diligent efforts for time-in-care grounds); *Mary Lou C.*, 207 Ariz. at 49, ¶¶ 14-15 (reasonable efforts for substance-abuse ground).  As a public entity, DCS must also provide a disabled parent with reunification services that comply with the ADA.  *Jessica P. v. Dep't of Child Safety*, 251 Ariz. 34, 38, ¶ 14 (App. 2021).  The ADA requires public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7)(i).  Even if we assume Mother qualifies as a person with a disability under the ADA, our analysis is the same because Arizona law's requirement that DCS make diligent and reasonable efforts to provide reunification services satisfies the ADA's reasonable accommodation requirement.  *Jessica P.*, 251 Ariz. at 39, ¶ 15; *Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 256, ¶ 20 (App. 2007); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 33 (App. 1999); *see also Canady v. Prescott Canyon Ests. Homeowners Ass'n*, 204 Ariz. 91, 95, ¶ 16 (App. 2002) (as amended) (noting "reasonable accommodations vary depending on the facts of each case" and "[w]hat is reasonable in a particular circumstance is a fact-intensive, case-specific determination" (citations and internal quotation marks omitted)).  DCS meets its obligations by providing a parent with "the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

**¶11**          DCS provided Mother with parent-aide services, visitation, substance-abuse treatment, drug-testing services, two psychological evaluations, psychiatric treatment, couples counseling, individual counseling, group counseling, and a family-reunification team.  The record

---

[1]      We address the juvenile court's order only to the extent it is challenged in Mother's and Father's opening briefs. *See Sholes v. Fernando*, 228 Ariz. 455, 457, ¶ 1 n.1 (App. 2011); *Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 167 (App. 1996) ("Issues not clearly raised and argued in a party's appellate brief are waived.").

indicates that DCS communicated with Mother's various medical providers and supports the juvenile court's finding that neither of the physicians who performed Mother's psychological evaluations "recommended any accommodation or services that were not already being provided by DCS." *Cf. Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96, ¶ 29 (App. 2009) (finding that an agency fails to make sufficient family reunification efforts when it neglects to offer the services recommended by its consulting experts). The record also shows that Mother was able to access and self-refer for services without assistance.

¶12        Mother argues that "[t]o accommodate [her], DCS [was] required to provide enhanced or supplemental training or services" and "modify the frequency and intensity of [her] counseling." Although Mother testified that she requested more frequent and meaningful counseling, DCS disputed this fact and Father testified that Mother never mentioned that she would like more intensive counseling services and did only the bare minimum in terms of engaging with services. Additionally, in February 2021 Mother declined services DCS offered through Terros Health and stopped attending scheduled individual counseling sessions. *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 34 (noting DCS is only obligated to provide services that have "a reasonable prospect of success" and is not obligated "to undertake rehabilitative measures that are futile").

¶13        Mother also argues that DCS was required to hold "staffings" to identify how to accommodate her needs. However, the record shows that DCS consulted with Mother's medical providers to develop an appropriate case plan and met with Mother and discussed her service plan. Accordingly, the juvenile court did not err in finding that DCS made reasonable and diligent efforts to provide Mother reunification services in compliance with applicable laws.

## II.    Termination of Father's Parental Rights.

¶14        Father argues that the juvenile court erred in terminating his parental rights to D.J. and B.J. on the fifteen-month ground, contesting the court's finding that he "had not remedied the circumstances that brought the children into the State's care and was incapable of exercising proper and effective parental control in the near future." Father also claims the court erred in "finding that [he] had substantially neglected or willfully refused to remedy the circumstances that gave rise to the out of home placement" and, on that basis, terminating his parental rights to D.R.J. under the six- and nine-month grounds.

¶15 The court found Father "failed to protect [the Children] by [not] ending his relationship with Mother," noting that "[o]n multiple occasions, Father declared that his relationship with Mother was ending, but he either did not end the relationship, or soon returned to the relationship on each occasion." The court acknowledged Father's testimony that "[a]t time of trial, he was no longer in a relationship with Mother," but noted he "had only ended the relationship just over a month prior to trial" and found this "recent disengagement from Mother on the eve of trial . . .'too little, too late.'" The court further noted that "Father's issues with co-dependence make disengagement from Mother for long periods of time very difficult" and the "[t]he strong likelihood is that if DCS was not involved with this family, Mother and Father would return to their relationship with the same unhealthy power dynamics, co-dependent relationship, and continuing drug use by Mother."

¶16 As discussed below, evidence supports the juvenile court's finding that, from 2018 to the time of the termination, Father had been unable, for any substantial amount of time, to address DCS's concerns regarding his relationship with Mother and domestic violence between the two and would not be capable of exercising proper and effective parental control in the near future. Thus, the court did not err in terminating Father's rights to D.J. and B.J. under the fifteen-month ground. However, the record does not show that Father substantially neglected or willfully refused to remedy those circumstances as required to terminate Father's rights to D.R.J. under the six- and nine-month grounds.

### A. Failure to Remedy Circumstances.

¶17 The court terminated Father's parental rights to D.J. and B.J. on the fifteen-month ground. Termination based on this ground requires DCS to prove that a parent "has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8). The relevant "circumstances" are those "existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007) (internal quotation marks and citation omitted).

¶18 The physician who evaluated Father in 2019 noted Father's struggle with co-dependence and unhealthy relationships and gave a guarded prognosis regarding Father's ability to safely parent in the near

future.  Although Father testified at the termination hearing that he separated from Mother, on various prior occasions Father had declared that his relationship with Mother was over but either did not end the relationship or reunited with Mother shortly after.  For example, Father told DCS that he was separating from Mother in February 2021 but soon resumed the relationship.  And after Mother was arrested in April 2021, Father again indicated that he was leaving her but testified at the termination hearing that he lived with Mother until July and did not officially break up with her until the beginning of August.

¶19        Further, Mother was receiving in-patient treatment at the time of the termination hearing and, when asked if she and Father were planning on getting a new residence together, stated "I don't know.  That's up in the air right now."  Mother also attended one of Father's individual counseling sessions in July and, in August or September, Parents had an altercation that resulted in the police being called.  Mother testified that, when the altercation occurred, she and Father were roommates but not dating.  Additionally, around two weeks before the termination hearing DCS reported that Father "ha[d] not made any substantial progress," "ha[d] been dishonest about his circumstances," and "continue[d] to demonstrate a lack of healthy boundaries with [Mother]."

¶20        DCS also instructed Father to self-refer for parenting classes designed to aid single parents and provided a service letter with recommended classes.  However, Father did not enroll in any of the recommended courses and only participated in some additional classes in the months right before the termination hearing that were not geared toward single parenting or parenting children the same ages as the Children. Moreover, although Father had been consistent with visitation in the months immediately preceding the termination hearing, DCS reports indicate that, before then, Father "ha[d] not been consistently attending visitation" and "[d]uring virtual visits, he left the screen altogether and essentially gave his visits to [Mother] instead."  Father also testified that he was living in a halfway house that did not accept children and would likely be there for several months.  Therefore, the juvenile court did not abuse its discretion in finding that Father had not remedied the circumstances that brought the Children into DCS's care and was incapable of exercising proper and effective parental control in the near future.

### B.        Substantial Neglect or Willful Refusal.

¶21        The juvenile court terminated Father's parental rights to D.R.J. on the six- and nine-month grounds.  Termination under these grounds

requires DCS to prove that a parent "has substantially neglected or wilfully refused to remedy the circumstances that cause the child to be in an out-of-home placement." A.R.S. § 8-533(B)(8)(a), (b). In contrast to the fifteen-month ground, these grounds focus on the "level of the parent's effort to cure the circumstances rather than the parent's success in actually doing so." *Marina P.*, 214 Ariz. at 329, ¶ 20. It is certainly true that termination under these grounds is "not limited to those who have completely neglected or willfully refused to remedy such circumstances" and where a parent "makes only sporadic, aborted attempts to remedy" such circumstances, the juvenile court "is well within its discretion in finding substantial neglect and terminating parental rights on that basis." *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 576-77 (App. 1994) (finding that a mother's successful efforts at recovery in the eight months before the termination hearing were "too little, too late" in light of her disappearance for months at a time and "only sporadic, aborted attempts to remedy her addiction" in the relevant time period). However, termination on this ground is not appropriate when a parent has made "appreciable, good faith efforts" to comply with remedial programs outlined by DCS. *Id.* at 576.

¶22 The record indicates that Father generally made "appreciable, good faith efforts" to participate in remedial programs suggested by DCS to address DCS's concerns regarding his relationship with mother. *JS-501568*, 177 Ariz. at 576. During 2019 and 2020, Father successfully completed domestic-violence treatment, parent-aide services, parenting classes, and individual counseling. In May 2021, DCS acknowledged in the termination petition it filed as to D.J. and B.J. that, up to that point, Father had "engag[ed] in all required services." At the termination hearing, DCS also agreed that, before Spring 2021, "Father had engaged in and completed a lot of the recommended services" and confirmed Father "had already participated in recommended services up until [Spring 2021]."

¶23 Also in May 2021, Father requested a meeting with DCS to discuss DCS's expectations and DCS provided him the updated service letter that recommended Father participate in additional parenting classes and individual counseling. Father did not enroll in the recommended parenting classes but, in July, began attending parenting classes through Family Involvement Center. By the time of the termination hearing, Father had attended eleven classes and was reported to have shown significant growth. Father also enrolled in individual counseling in July and completed four sessions with Valle de Sol, after which the counselor noted that "[n]o further counseling is needed." Beginning in early September, Father had been actively engaged in counseling through Family Involvement Center. Further, as previously noted, DCS records indicate

that in the two months before the hearing, Father had been consistent in his separate visitation and was "engaged during the visits."

¶24     Throughout the proceedings, Father acknowledged the threat of Mother's substance abuse and domestic violence to the Children's safety. Notably, in the weeks before the termination hearing, Father petitioned to have Mother treated in-patient at a psychiatric hospital. And at the hearing, Father testified that he was no longer living with Mother, had not seen her in approximately two months, ended his relationship with her, and did not have any plans to reconcile with her. These are "more than trivial or de minim[is] efforts at remediation," *see JS-501568*, 177 Ariz. at 576 & n.1, and show Father made at least some effort to cure the circumstances causing the Children's out-of-home placement. Further, while DCS asserted "the circumstance causing [D.R.J.'s] out-of-home placement was Father's substantial neglect or wilful refusal to end his volatile relationship with Mother," it did not present evidence that Father refused to separate from Mother nor that DCS had instructed Father to do so. Thus, the record demonstrates Father's efforts. *Marina P.*, 214 Ariz. at 329, ¶ 20. Because the evidence does not support a finding that Father substantially neglected or willfully refused to remedy the circumstances causing D.R.J.'s out-of-home placement, the juvenile court erred in terminating Father's parental rights to D.R.J. on the six- and nine-month grounds.[2]

## CONCLUSION

¶25     For the foregoing reasons, we affirm the termination of Mother's parental rights to the Children and termination of Father's parental rights to D.J. and B.J. However, we vacate the juvenile court's order terminating Father's rights to D.R.J. and remand the case for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED:     AA

---

[2]     We express no opinion on whether termination of Father's parental rights to D.R.J. would have been, or will in the future be, proper on another ground. We only hold that termination based on the six- and nine-month grounds was not justified on this record.